## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO; NATIONAL ASSOCIATION OF GOVERNMENT EMPLOYEES, INC.; AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO; NATIONAL FEDERATION OF FEDERAL EMPLOYEES, IAM, AFL-CIO; INTERNATIONAL FEDERATION OF PROFESSIONAL & TECHNICAL ENGINEERS, AFL-CIO; NATIONAL NURSES ORGANIZING COMMITTEE/NATIONAL NURSES UNITED; SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO; AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS; <br><br> *Plaintiffs*, <br><br> v. <br><br> U.S. FEDERAL LABOR RELATIONS AUTHORITY, <br><br> *Defendant*. | CASE NO. 1:26-cv- <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.      For more than forty years, federal employees seeking to form unions at their workplaces have done so by petitioning a Regional Director of the Federal Labor Relations Authority ("FLRA" or "Authority"). Pursuant to a longstanding delegation from the three-member FLRA—a delegation expressly contemplated by the Federal Service Labor-Management Relations Statute—each Regional Director has adjudicated all forms of representation petitions, approved election agreements, decided when hearings are warranted, determined appropriate bargaining units, and certified elections in cases assigned to their regional office.

2.      Regional Directors are career professionals. When the Authority first fully delegated decision-making authority for representation cases to them, both labor and management supported the delegation. Permitting Regional Directors to use their expertise to handle and decide representation matters has allowed for more efficient processing of representation petitions, ensuring that federal employees are more quickly able to exercise their statutory rights to form unions and secure the benefits of union representation. It has also preserved resources for Authority Members to perform their other statutory duties, including deciding arbitration exceptions, unfair labor practice appeals, and negotiability disputes.

3.      In certain circumstances outlined in the FLRA's representation regulations, unions and agencies can currently seek review of the Regional Directors' decisions and orders. This process allows the parties to seek review if the Regional Directors failed to apply established law, committed prejudicial procedural error, or committed clear and prejudicial error on a substantial factual matter. It also allows parties to seek a decision from the Authority when no precedent governed their cases or when established law or policy should be reconsidered.

4.  While most Regional Director decisions never reach the Authority on an application for review, this two-stage system provides a crucial backstop for review to reduce error and maintain trust in the federal labor relations system. Having a second layer of review is especially critical considering that orders "involving an appropriate unit determination" are carved out of a judicial-review provision of the Federal Service Labor-Management Relations Statute that is applicable to FLRA orders. 5 U.S.C. § 7123(a)(1).

5.  Last month, the Federal Labor Relations Authority, a three-member body composed of political appointees, announced over a dissent that this longstanding structure would end effective April 23, 2026. Beginning on that date, with no exception even for pending cases, Regional Directors would be stripped of their delegated responsibilities and the three-member Authority would be solely responsible for determining the contours of an appropriate unit, authorizing the commencement of all investigations and hearings, approving election agreements, determining whether a question of representation exists and directing an election, authorizing the supervision and conduct of elections, and certifying election results.

6.  Despite the sweeping nature of this change, the FLRA gave only the most threadbare and unconvincing explanation for its action. This dramatic overhaul of how federal employees and their unions can obtain exclusive representation rights at agencies and the additional statutory labor rights that flow from such representation will inevitably impair and delay their ability to exercise those rights.

7.  By making such a radical change without providing a reasoned explanation, the FLRA acted arbitrarily and capriciously in violation of the Administrative Procedure Act. It failed to address obvious objections to the framework, which was originally enacted to ensure that representation petitions were addressed expeditiously. And its primary explanation—that parties

2

would no longer need to file two briefs—failed to acknowledge, let alone address, the fact that applications for review of Regional Director decisions are relatively rare and that there are obvious differences between litigating a full case before a Regional Director and briefing an appeal to the three-member Authority.

8.      Furthermore, the FLRA's decision to implement this rule in just thirty days was independently arbitrary and capricious. The FLRA gave no explanation at all as to why its longstanding practice must change so quickly, nor why already-pending cases must be governed by the new framework.

9.      Finally, the above flaws in the rule were exacerbated by the FLRA's failure to comply with the APA's notice-and-comment requirement. By issuing an "interim final rule" with a fixed implementation date, without previously publishing the rule or accepting comments, the FLRA unlawfully failed to hear from the stakeholders whose substantive rights are affected by the rule.

10.     Each of these flaws in the Interim Final Rule's compliance with the Administrative Procedure Act is fatal, and each independently requires that it be set aside.

### JURISDICTION

11.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702 because it arises under federal law, including the Administrative Procedure Act, 5 U.S.C. §§ 701, *et seq*. The Interim Final Rule is a rule making pursuant to 5 U.S.C. § 551 and 5 U.S.C. § 7134.

12.     Plaintiffs seek a declaratory judgment pursuant to 28 U.S.C. § 2201.

3

**VENUE**

13.     Venue is proper in this district under 28 U.S.C. § 1391(e) because Plaintiff National Association of Government Employees resides here and also because a substantial part of the events or omissions giving rise to the claim occurred here.

**PARTIES**

14.     Plaintiff American Federation of Government Employees, AFL-CIO ("AFGE") is a labor organization and unincorporated association headquartered at 80 F Street NW, Washington, DC 20001. AFGE, the largest union of federal workers, represents approximately 800,000 federal civilian employees through its affiliated councils and locals in every state in the United States and the District of Columbia. It represents more than 4,000 federal employees in Massachusetts, at agencies including, but not limited to: the U.S. Department of Veterans Affairs, Social Security Administration, Bureau of Prisons, and Department of Labor.

15.     Plaintiff National Association of Government Employees, Inc. ("NAGE"), also known as the National Association of Government Employees, SEIU Local 5000, is a labor organization headquartered at 159 Thomas Burgin Parkway, Quincy, Massachusetts 02169. NAGE is also an affiliate of Service Employees International Union ("SEIU"). In addition to many thousands of state, municipal, and private sector employees, NAGE represents approximately 75,000 federal civilian bargaining unit employees. NAGE represents approximately twenty-one federal bargaining units in Massachusetts, including thousands of federal employees working in the commonwealth.

16.     Plaintiff American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME") is a national labor organization and unincorporated membership association headquartered at 1625 L Street NW, Washington, DC 20036. AFSCME is the largest trade union

4

of public employees in the United States, with around 1.4 million members organized into approximately 3,400 local unions, 58 councils, and affiliates in 46 states, the District of Columbia and Puerto Rico. AFSCME, through its subordinate bodies, represents thousands of federal civilian employees in agencies and departments across the federal government.

17.     Plaintiff National Federation of Federal Employees, IAM, AFL-CIO ("NFFE") is an unincorporated association with its principal place of business in Washington, DC. NFFE, the nation's first federal union, is a national labor union representing approximately 110,000 professional and non-professional federal government workers across the United States.

18.     Plaintiff International Federation of Professional and Technical Engineers, AFL-CIO ("IFPTE") is a labor organization whose local unions serve as the bargaining representatives for federal employees at multiple agencies including the Department of Defense, Environmental Protect Agency, NASA, and the Social Security Administration. IFPTE Locals have represented federal employee bargaining units for more than forty-five years.

19.     Plaintiff National Nurses Organizing Committee/National Nurses United ("NNOC/NNU") represents Registered Nurses working in the Department of Veterans Affairs across thirteen states who provide care to our nation's veterans through a broad range of services.

20.     Plaintiff Service Employees International Union, AFL-CIO ("SEIU") is a labor organization of approximately two million working people united by the belief in the dignity and worth of workers and the services they provide. It is headquartered in Washington, DC. SEIU's members work in healthcare, the public sector, and property services. SEIU, together with its local affiliates, represents approximately 80,000 federal employees across multiple agencies.

21.     Plaintiff American Federation of Labor and Congress of Industrial Organizations ("AFL-CIO") is a federation of sixty-five national and international labor unions that represent

approximately 15 million working people. Many AFL-CIO affiliated unions represent federal employees.

22.    Plaintiffs bring this action on behalf of themselves as organizations and on behalf of their affiliates and members, who face losses of their statutory and contractual protections at work due to the Interim Final Rule.

23.    Defendant U.S. Federal Labor Relations Authority is a federal agency within the meaning of the Administrative Procedure Act, 5 U.S.C. § 551(1), headquartered in Washington, DC.

## FACTUAL BACKGROUND

### I.    Congress Establishes the Statutory Collective Bargaining Framework for Federal Employees

24.    In 1978, Congress enacted the Federal Service Labor-Management Relations Statute ("FSLMRS" or "the Statute"), which established a comprehensive framework governing collective bargaining for federal civil service employees. The FSLMRS is contained within Title VII of the Civil Service Reform Act of 1978 ("CSRA") and codified as Chapter 71 of Title 5 of the U.S. Code.

25.    In enacting the CSRA, Congress expressly found that "the statutory protection of the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them . . . safeguards the public interest" and "contributes to the effective conduct of public business," and therefore "labor organizations and collective bargaining in the civil service are in the public interest." 5 U.S.C. § 7101(a).

26.    The Statute guarantees employees "the right to form, join, or assist any labor organization, or to refrain from any such activity." *Id.* § 7102.

27.    The Statute also guarantees employees the right to "engage in collective bargaining with respect to conditions of employment through representatives chosen by employees under this chapter." *Id.* § 7102(2).

28.    The Statute requires agencies to "accord exclusive recognition to a labor organization if the organization has been selected as the representative, in a secret ballot election, by a majority of the employees in an appropriate unit who cast valid ballots in the election." *Id.* § 7111(a).

29.    Once labor organizations are certified as exclusive representatives, they must act for "all employees in the unit" and are required to represent the interests of all such employees "without discrimination and without regard to labor organization membership." *Id.* § 7114(a)(1).

30.    "Any agency and any exclusive representative in any appropriate unit" are obligated to "meet and negotiate in good faith for the purposes of arriving at a collective bargaining agreement." *Id.* § 7114(a)(4).

31.    The duty to negotiate in good faith with a certified exclusive representative includes additional statutory obligations, including an agency's duty to "furnish to the exclusive representative involved" certain information that is "reasonably available and necessary for full and proper discussion, understanding, and negotiation of subjects within the scope of collective bargaining[.]" *Id.* § 7114(b)(4).

32.    The duty to negotiate in good faith with exclusive representatives also encompasses a duty, subject to limited exceptions, to not make changes to existing terms and conditions of employment before completing bargaining. *U.S. DOJ Exec. Off. for Imm. Review*, 55 F.L.R.A. 454, 455–56 (1999); *see* 5 U.S.C. § 7116(a)(5).

33.    Exclusive representatives are also entitled to be present at any formal discussion between an agency and a bargaining unit member "concerning any grievance or any personnel policy or practices or other general condition of employment," as well as any examination of a bargaining unit employee that the "employee reasonably believes . . . may result in disciplinary action" if the employee requests representation. *Id.* § 7114(a)(2).

34.    Exclusive representatives of "a substantial number of employees" within an agency are also granted statutory consultation rights "with respect to any Government-wide rule or regulation issued by the agency effecting any substantive change in any condition of employment." *Id.* § 7117(d)(1).  And when no labor organization has exclusive representation on an agency basis, an exclusive representative of a "substantial number of the employees of the agency" is granted "national consultation rights" regarding "substantive change[s] in conditions of employment proposed by the agency." *Id.* § 7113.

35.    Federal employees voluntarily choose to join labor organizations and to pay membership dues to those organizations. *Id.* U.S.C. § 7115. If an employee within a bargaining unit chooses to pay dues to an exclusive representative and provides a written authorization to do so, agencies are required to deduct membership dues from an employee's pay and transmit those dues to the labor organization. *Id.*

36.    Pursuant to the rights granted by Congress in the Statute, federal employees across the government have a long history of joining labor organizations including Plaintiffs, petitioning for exclusive representation, and collectively bargaining with their employers. And for years, Plaintiffs and their affiliates have used, and expect to continue to use, the FLRA's representation proceedings to secure these rights for themselves and the employees they represent.

**II.     The Authority's Structure for Deciding Representation Cases**

37.     The Statute created the Federal Labor Relations Authority ("FLRA" or "Authority"), a three-member independent agency, to oversee federal sector bargaining.

38.     The Authority's members are presidentially appointed and Senate-confirmed for five-year terms. Congress mandated that they "may be removed by the President only upon notice and hearing and only for inefficiency, neglect of duty, or malfeasance in office." *Id.* § 7104(b).

39.     The Statute also created the General Counsel of the Authority, a presidentially-appointed, Senate-confirmed position who is tasked with investigating unfair labor practices, filing complaints, and exercising other powers prescribed by the Authority. *Id.* § 7104(f).

40.     So that the Authority could carry out its responsibilities, Congress provided that the Authority "shall appoint an Executive Director and such regional directors, administrative law judges . . . and other individuals as it may from time to time find necessary for the proper performance of its functions." *Id.* § 7105(d).

41.     Congress expressly provided that the Authority may delegate to a Regional Director its authority "(A) to determine whether a group of employees is an appropriate unit; (B) to conduct investigations and to provide for hearings; (C) to determine whether a question of representation exists and to direct an election; and (D) to supervise or conduct secret ballot elections and certify the results thereof." *Id.* § 7105(e)(1).

42.     Under the Statute, if such decisions are delegated to Regional Directors, the Authority may review this action within 60 days if an interested person so requests, "but the review shall not, unless specifically ordered by the Authority, operate as a stay of action." *Id.* § 7105(f).

43.     In 1979, on the heels of the Statute's enactment, the Authority issued its first "interim rules" governing representation case processing, finding "good cause" for doing so on an interim basis due to an "urgent need to avert a serious disruption of the Federal labor-management

relations program and to avoid any prejudice to the rights of interested parties." 44 Fed. Reg. 44740, 44740 (July 30, 1979).

44.    The interim rules permitted Regional Directors to, among other things, investigate representation petitions, approve agreements for consent elections, and to issue notices of hearings. *Id.* at 44755–57 (§§ 2422.4, 2422.6, 2422.7, 2422.8).

45.    The Final Rule issued in January 1980 did the same, and explained that "for the present" the Authority would not delegate making appropriate unit determinations to Regional Directors, as "[s]uch a delegation would be premature because of the absence of established case law under the Statute with respect to appropriate units and related issues." 45 Fed. Reg. 3482, 3483 (Jan. 17, 1980).

46.    Accordingly, while the Authority transitioned from the prior, executive order-driven labor relations program to the still-nascent statutory scheme, when representation hearings concluded at the regional level, "the case [was] transferred automatically to the Authority," where "[t]he Authority [would] issue a decision determining the appropriate unit, directing an election or dismissing the petition[.]" *Id.* at 3504 (§§ 2422.15, 2422.16).

47.    Three years later, having had the opportunity to establish foundational case law, the Authority fully delegated representation-case decision making to its Regional Directors. It did so to "provide for the expeditious processing and determination of representation matters." 48 Fed. Reg. 28814, 28814 (June 23, 1983). After issuing a proposed rule and permitting notice and comment, 48 Fed. Reg. 28816 (June 23, 1983), the Authority issued its final rule in September 1983. 48 Fed. Reg. 40189 (Sep. 6, 1983).

10

48.     Under the 1983 Rule, Regional Directors would issue Decisions and Orders after holding representation hearings. These orders would become the decision of the Authority unless, after a party sought review, the Authority granted review of the decision. *Id.* at 40192 (§ 2422.17).

49.     Parties dissatisfied with an order of the Regional Director did not have an appeal as of right. Instead, they could seek discretionary review of the decision if one of the limited grounds set forth in the regulation were met. *Id.* (§ 2422.17).

50.     In 1995, the Authority went through a thorough process to amend its representation regulations. It established a Task Force that conducted focus groups before issuing a proposed rule in August 1995. 60 Fed. Reg. 39878, 39878 (Aug. 4, 1995). These proposed amendments made "the rules more flexible in addressing the representational concerns of agencies, labor organizations, and individuals." *Id.*

51.     After again going through notice-and-comment, the Authority enacted its final rule on representation petitions in December 1995, set to be effective more than three months later, on March 15, 1996. 60 Fed. Reg. 67288, 67288 (Dec. 29, 1995). This was the last major rule change governing representation petitions.

52.     Under the current regulations, nearly all representation petitions are handled exclusively by a Regional Director without reaching the Authority. For example, in 2024, 185 representations were filed at the Office of General Counsel ("OGC") (where Regional Directors are employed), compared to 3 new representation cases at the Authority itself. In 2025, 277 representation petitions were filed at the OGC, compared to 6 at the Authority.

53.     This filtering effect makes perfect sense considering the Regional Directors' ability to facilitate agreements between unions and agencies and the limited grounds of review available

11

for their decisions and orders under the FLRA framework. At present, the Authority may only grant an application for review of a representation decision if:

**(1)** The decision raises an issue for which there is an absence of precedent;
**(2)** Established law or policy warrants reconsideration; or,
**(3)** There is a genuine issue over whether the Regional Director has:
    **(i)** Failed to apply established law;
    **(ii)** Committed a prejudicial procedural error; or
    **(iii)** Committed a clear and prejudicial error concerning a substantial factual matter.

5 C.F.R. § 2422.31(c).

54.    While any representation petition is being processed, the status quo is protected for currently certified exclusive representatives. Under current regulations, "[w]hen a representation proceeding is pending, parties must maintain existing recognitions, follow the terms and conditions of existing collective bargaining agreements, and fulfill all other representational and bargaining responsibilities under the Statute." 5 C.F.R. § 2422.34(a).

### III.    The FLRA Upends More Than Four Decades of Practice Without Notice and Comment, Effective April 23, 2026

55.    While previous overhauls of the FLRA's representation framework have been introduced by publishing proposed rules, permitting notice and comment, and only then issuing a final rule after having the benefit of hearing from stakeholders and the public, the Authority has now taken a different tack.

56.    On March 24, 2026, the FLRA announced an "interim final rule" that stripped Regional Directors of their longstanding authorities over representation petitions effective April 23, 2026. 91 Fed. Reg. 13933 (Mar. 24, 2026) ("Interim Final Rule").

57.    Under the Interim Final Rule, so long as the Authority has at least a two-member quorum, the Authority will itself make final decisions involving representation cases, including all "determinations specified in 5 U.S.C. [§] 7105(e)(1)." *Id.* at 13934.

58. While the Interim Final Rule explains that the Authority itself will "determine whether a group of employees is an appropriate unit, authorize the regional offices or Authority staff to conduct all investigations and hearings, determine whether a question of representation exists and direct an election, and authorize the regional offices or Authority staff to supervise or conduct elections, after which the Authority will certify the results thereof[,]" it does not explain how, when, or under what standard the Authority will make these determinations. *Id.* (cleaned up).

59. While the Interim Final Rule asserts that this dramatic change will "streamlin[e] the decisionmaking process," it fails to acknowledge the Authority's past rationale that delegating authority to Regional Directors would "expedite" the representation process, much less provide a reasoned explanation as to why this is not correct. It also fails to acknowledge that under the current process, appeals of Regional Director decisions are quite rare; for example, the FLRA's own statistics show that in 2025, 277 representation petitions were filed in regional offices, while only 6 representation appeals were filed at the Authority.

60. At present, Regional Directors are empowered to approve election agreements between the parties and direct elections accordingly. But pursuant to the Interim Final Rule, the Authority itself "will make decisions on election agreements and directions of election." *Id.*

61. While the Interim Final Rule's explanation suggests that in some instances, Regional Directors will continue to be involved in the processing of representation petitions, *see id.* ("The Authority and regional offices will work collaboratively to resolve representation matters."), the Interim Final Rule provides little clarity as to how this will work in practice. It is apparent, however, that that Regional Directors will no longer be independent decisionmakers.

62. Indeed, the Interim Final Rule explains that the Authority will take on *even more* control over certain cases: the FLRA states that it "anticipates that the regional offices will continue

13

to conduct *most* investigations and hearings in representation matters after receiving the Authority's authorization" and that "the FLRA intends, in *most* cases, for the regional offices to continue conducting elections with the Authority's authorization." *Id.* (emphasis added).

63.    However, the Interim Final Rule provides no explanation as to which cases will be more directly controlled by the Authority. As Member Anne Wagner stated in her dissenting view, the Interim Final Rule "does not contain a detailed description of how representation cases will be processed internally at the FLRA under the new regulations—undoubtedly because we are still in the process of making those determinations." *Id.* at 13949.

64.    The Interim Final Rule also eliminates the current two-level process of review, where initial decisions made by a Regional Director could be appealed under certain circumstances to the Authority itself. *Id.* at 13937. Unions, including Plaintiffs, will therefore lose recourse to a second decisionmaker to protect against errors and improve confidence in the representation system.

65.    This elimination of an entire level of review is particularly harmful considering that under the Statute, any "order" arising out of a representation petition "involving an appropriate unit determination" is carved out of the Statute's provision for judicial review of FLRA "order[s]." 5 U.S.C. § 7123(a)(2).

66.    To implement the Interim Final Rule, "[f]or the reasons further explained in the interim final rule amending the FLRA's regulations," the Authority also amended its "Memorandum Describing the Authority and Assigned Responsibilities of the General Counsel of the Federal Labor Relations Authority" to delete the current delegation of Regional Director authority to process and determine representation matters and replace it with a delegation that takes

14

effect only when the Authority lacks a quorum. 91 Fed. Reg. 13949, 13950 (Mar. 24, 2026) ("Memorandum Amendment").

67.     FLRA Member Anne Wagner correctly explained in her dissenting view that the FLRA's "revisions reflect the biggest changes to the FLRA's representation case processing in nearly 43 years." Interim Final Rule at 13949 (Member Wagner, dissenting).

68.     As Member Wagner set forth, "a need for nearly immediate implementation . . . is not present here." *Id.* At no point does the Interim Final Rule explain why its implementation date of April 23, 2026 is appropriate or justified.

69.     While the FLRA announced when it published the Interim Final Rule that comments would be accepted if submitted by the Rule's effective date, these comments of course were not considered as part of the Rule that will soon take effect. Such a decision to use interim final rulemaking effectively tells unions and agencies that "although we welcome their comments, we will not necessarily consider them." *Id.*

70.     Taking action before hearing from stakeholders has resulted in a flawed rule. This is no surprise, as "[c]omments on proposed regulations often improve those regulations, including by raising issues that the drafters have not considered." *Id.* (Member Wagner, dissenting).

## IV.     The Interim Final Rule Will Harm Plaintiffs and Their Members

71.     The Interim Final Rule, if it takes effect, will harm Plaintiffs and their members.

72.     Plaintiffs collectively represent hundreds of thousands of federal employees at agencies across the government.

73.     Plaintiffs, including through their affiliates, have pending representation matters in several regional offices which would be affected by the dramatic changes put forward in the Interim Final Rule, including election petitions, unit clarification petitions, and decertification

petitions. For example, Plaintiff AFGE has at least 30 pending representation petitions at FLRA regional offices in which it is a party, including a pending election petition involving employees in Massachusetts. Plaintiff NFFE has at least 10 pending representation matters. Plaintiffs AFSCME, IFPTE, and NAGE also have pending representation matters.

74. Many Plaintiffs also have ongoing organizing drives that will result in the filing of election petitions throughout 2026, including after the currently scheduled effective date of the Interim Final Rule.

75. Timely processing of election petitions are crucial for Plaintiffs and their members because "the union, unless an election can be promptly be held to determine the choice of representation, runs the risk of impairment of strength by attrition and delay while the case is dragging on[.]" *Boire v. Greyhound Corp.*, 376 U.S. 473, 478 (1964) (citation omitted).

76. Agencies across the government have announced planned reorganizations that may lead to additional representation matters affecting Plaintiffs and their members. For example, the USDA's Forest Service recently announced what it deems a "sweeping restructuring" in which it plans to relocate numerous positions. This is in addition to the USDA's announced agency-wide reorganization. The U.S. Department of Transportation has also announced the reorganization of the Federal Aviation Administration's (FAA) organizational structure. Plaintiffs represent employees at agencies facing recently announced and impending reorganizations; as just one example, Plaintiff AFSCME represents employees at the USDA and FAA. Agency reorganizations often lead to new representation petitions that must be processed, including petitions to clarify bargaining units or consolidate bargaining units.

77. Whether petitioning to represent new bargaining units or consolidate units or responding to agency petitions seeking to clarify units or decertify unions, Plaintiffs rely on having

16

effective, experienced Regional Directors who are empowered to process these petitions efficiently and work with parties to reach agreement when possible.

78.     While filing applications for review are relatively rare, Plaintiffs also rely on the currently available application for review process to serve an error-correcting function, ensuring that a second decision-maker is available to review representation decisions and that the first decision-maker will be conscious of the prospect of review.

79.     Furthermore, while a representation proceeding is pending, including while an application for review is pending, agencies are required to maintain the status quo, including maintaining existing recognitions and following the terms of existing CBAs. Eliminating the time period during which Plaintiffs may file applications of review of Regional Director decisions which negatively affect them therefore eliminates a time period in which their current statutory and contractual rights are protected.

80.     By delaying union elections and certifications, the Interim Final Rule extends the time that federal employees and their unions are unable to access the rights granted to exclusive bargaining representatives under the Statute. As a result, Plaintiffs and their affiliates will have materially less time in which they can perform core services for their members: representing them in negotiations to secure binding collective bargaining agreements and enforcing those obligations through contractual grievance procedures. And Plaintiffs' members and bargaining unit employees will have materially less time in which they can enjoy the benefit of these services and days in which they are protected by statutory rights, including protections against unilateral changes to their terms and conditions of employment.

81.     Efforts to prepare for and counteract the harm from the Interim Final Rule is diverting Plaintiffs' employees and resources away from their core mission of organizing and

17

representing employees, negotiating with employers, and advocating for improved employment conditions.

### Count I

*Violation of the Administrative Procedure Act –Arbitrary and Capricious (Interim Final Rule)*

82.    Plaintiffs reallege Paragraphs 1 through 81.

83.    The Interim Final Rule, scheduled to take effect in its current form on April 23, 2026, is a final agency action within the meaning of 5 U.S.C. § 704.

84.    The Administrative Procedure Act requires courts to "hold unlawful and set aside agency action" which is found to be arbitrary and capricious. 5 U.S.C. § 706(2)(A).

85.    Agency action is arbitrary and capricious if it is unreasonable or not reasonably explained, including, for example, where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

86.    "An agency may not . . . depart from a prior policy sub silentio or simply disregard rules that are still on the books." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Instead, it must give a "reasoned explanation" for such departure and "show that there are good reasons for the new policy." *Id.* at 515–16.

87.    The Interim Final Rule fails to provide a reasoned explanation for the FLRA's reversal of more than four decades of permitting Regional Directors to decide representation cases.

88.    In 1983, the delegation of decision-making authority to Regional Directors was undertaken to provide for "expeditious processing and determination of representation matters." 48 Fed. Reg. 28814. The FLRA has failed to address how reversing this change would affect the

18

time it takes for unions to obtain recognition and exercise the statutory rights of themselves and their members.

89.    Indeed, in FY 2025, the Authority's own performance report stated that it did not meet its targets for the "average age of representation cases decided or otherwise resolved by the Authority" nor the "average age of representation cases pending before the Authority." *FLRA, Performance and Accountability Report* 25 (2025), https://www.flra.gov /system/files/webfm/FLRA%20Agency-wide/Public%20Affairs/PAR/FLRA%20FY2025%20 PAR.pdf. In contrast, targets for the percentage of cases "resolved by the OGC through withdrawal, election, or issuance of a Decision or Order within 120 days of the filing of a petition" and the same "within 365 days of the filing of a petition" were met by the OGC and its Regional Directors. *Id.* at 19. It is both implausible and unexplained that these unacceptable delays at the Authority level would be remedied by requiring the Authority to take on an enormous amount of additional representation decisions.

90.    The Interim Final Rule also fails to address the benefits that result from having a two-level appeal process that provides for potential review by multiple decision-makers. Eliminating the possibility of a second layer of review will increase errors in the representation process, reduce accountability for poor decision-making, and result in decreased trust in the process.

91.    The Authority's explanation that parties now will not "need[] to make their arguments twice, and without the need to file an appeal of the initial decision," Interim Final Rule at 13934, falsely suggests that parties now are engaged in repetitive briefing and fails to address the important funneling mechanism from the current structure's petition for review process. By reducing the number of run-of-the-mill cases and decisions that must be decided by the three-

member Authority, the current structure preserves Authority resources for petitions that raise more difficult questions of lack of precedent or changes in law or policy and ensures that they have a reasoned decision from an experienced adjudicator from which to begin their analysis.

92.     At no point during the Authority's 1983 or 1995 representation rule-makings, both of which were adopted using notice-and-comment, did any commentors object to the basic delegation to Regional Directors itself or to the limited appeals process. Indeed, both union and management representatives generally respect the professionalism, impartiality, and expertise of Regional Directors and their staff, which further contributes to the low number of cases which are typically appealed to the full Authority.

93.     In addition, at no point does the Interim Final Rule address the reliance interests that Plaintiffs and their members have in the current representation framework, which provides an efficient mechanism for federal employees to gain access to their statutory rights and protections. Plaintiffs, like all unions, must decide how to allocate their scarce resources as between multiple programmatic objectives, including organizing new units and maintaining or enhancing representational services for existing members. The Interim Final Rule's new structure, and accompanying inefficiency and delay, will burden new organizing and thereby alter each union's programmatic calculus.

94.     The multiple indicia of arbitrary and capricious action set forth above suggest that the FLRA may be adopting this dramatic departure from its decades-long practice for reasons other than those stated in the FLRA's cursory explanation for the Interim Final Rule. But regardless, that explanation is insufficient to satisfy the APA's requirement of a reasoned explanation.

95.     Accordingly, the Interim Final Rule should be held unlawful and set aside.

## Count II

*Violation of the Administrative Procedure Act –Arbitrary and Capricious (Effective Date of Interim Final Rule)*

96.    Plaintiffs reallege Paragraphs 1 through 95.

97.    All components of a rule or other final agency action, including the action's effective date, are subject to arbitrary and capricious review under the APA.

98.    The FLRA issued its Interim Final Rule with an effective date of just thirty days from publication without providing any explanation as to why such a quick transition is needed.

99.    The FLRA also failed to explain why petitions that have previously been filed should be subject to this new regime.

100.    Such an imminent effective date stands in stark contrast to the FLRA's last major change to the representation rule process, which took effect more than three months after the Final Rule was published and seven months after it was proposed and did not apply to petitions filed before the effective date of the Final Rule.

101.    Indeed, one member of the Authority even noted that "we are still in the process" of determining "how representation cases will be processed internally at the FLRA under the new regulations," providing "another reason not to rush the process." Interim Final Rule at 13949 (Member Wagner dissenting).

102.    Accordingly, the Interim Final Order's effective date of April 23, 2026 should be held unlawful and set aside.

## Count III

*Violation of the Administrative Procedure Act – Failure to Provide Notice and Comment*

103.    Plaintiffs reallege Paragraphs 1 through 102.

21

104.    The Administrative Procedure Act requires agencies to publish "notice of proposed rule making" in the Federal Register and to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(b), (c).

105.    These requirements extend not only to the promulgation of new rules, but also to rescinding or amending rules. *Id.* § 551(5); *see Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015) (explaining that the APA "mandate[s] that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance.")

106.    Had the FLRA's Interim Final Rule been the subject of advance publication and notice-and-comment rulemaking, Plaintiffs would have submitted comments opposing this radical change to the representation framework before the agency had committed itself to a course of action. This notice-and-comment process would have allowed Plaintiffs and other adversely affected persons to submit comments with a greater opportunity to persuade the agency, at a time when the relevant decision-makers would naturally be more receptive to outside input.

107.    Contrary to the FLRA's assertion, the Interim Final Rule does not fit into the APA's exception for "rules of agency organization, procedure, or practice," 5 U.S.C. § 553(b)(A), which "must be narrowly construed." *AFL-CIO v. NLRB*, 57 F.4th 1023, 1035 (D.C. Cir. 2023) (citation omitted).

108.    Because the Interim Final Rule's restructuring of the representation process affects substantial rights and interests of Plaintiffs and their members, it does not fall within the APA's narrow exception for procedural rules.

109.    The APA instructs that a reviewing court shall "hold unlawful and set aside agency action . . . found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

110.    The Interim Final Rule does not adhere to the procedural requirements of 5 U.S.C. § 553(b) and (c) and thus violates the Administrative Procedure Act. It is therefore unlawful and should be set aside.

## Relief Requested

**WHEREFORE**, Plaintiffs pray that this Honorable Court enter an ORDER:

A. Declaring that the Interim Final Rule, and to the extent independently effective, the Memorandum Amendment, violates the Administrative Procedure Act and therefore is null and void;

B. Preliminarily and permanently enjoining the FLRA from implementing or otherwise giving effect to the Interim Final Rule, and to the extent independently effective, the Memorandum Amendment;

C. Staying, postponing, or preliminarily setting aside the Interim Final Rule, and to the extent independently effective, the Memorandum Amendment, pursuant to 5 U.S.C. § 705, and permanently doing the same pursuant to 5 U.S.C. § 706;

D. Awarding Plaintiffs their attorney's fees and costs; and

E. Granting such other relief as this Court may deem just and proper.

Date: April 15, 2026

Respectfully submitted,

*/s/ Jillian M. Bertrand*_____

Leon Dayan*
Lane Shadgett*
J. Alexander Rowell*
**Bredhoff & Kaiser, PLLC**
805 15th Street NW, Suite 1000
Washington, D.C. 20005
Tel: (202) 842-2600

Alfred Gordon O'Connell, BBO # 630456
Jillian M. Bertrand, BBO # 682214
**Pyle Rome Ehrenberg PC**
2 Liberty Square, 10th Floor
Boston, MA 02109
Tel: (617) 367-7200
Fax: (617) 367-7200

23

Fax: (202) 842-1888
ldayan@bredhoff.com
lshadgett@bredhoff.com
arowell@bredhoff.com

agordon@pylerome.com
jbertrand@pylerome.com

*Attorneys for Plaintiffs*
**Pro Hac Vice Motion Forthcoming*

24